Mr. O'Connor. May it please the Court, Mr. Casey, members of the panel. Your Honors, we're here today on three points raised by my client. Point one is insufficiency of the evidence as it relates to the stalking encounter. Point two is that testimony as it relates to the interstate stalking was based on perjured testimony. And third, that the Court erred in setting an unreasonable sentence in this case. Because counts one and counts, I mean, argument one and argument two were basically inextricable in my mind in terms of bringing it together in argument for you, I would like to kind of argue those both of those cases kind of in tandem. The defendant was found not guilty. There were four stalking counts. He was found not guilty of counts three and four as it related to Zao Jiang and Yeo Shing. And the evidence in that case was the same as the evidence as it relates to counts one and two, except for events that occurred on October 1, 2017. And that's what I'm going to concentrate with you here today. And those involved, I'll just use first names. Count one was Liu, L-I-U, and count two was Wu, W-U. The instructions given in the case as to all of the counts as it related to the interstate stalking had these elements, and I want to go through each one and then make my argument to this Court as to where the government, I believe, failed in its burden of proof. Count one, number one element to the stalking charge is that between on or about October 1, 2017 and December 22, 2017, the defendant traveled interstate or foreign commerce. There was absolutely no evidence presented to this Court from where the defendant began his day. We don't know if he traveled interstate or intrastate. It was never established by the government. I just want to ask one question about that. And I hate to pick on you, but I think during your closing argument, you said that on or about October 1st, the defendant traveled in interstate or foreign commerce. He did. He went from Missouri to Kansas. And I think that that's a quote out of the transcript. Now, we've not joined those circuits that have said explicitly that counsel can waive an element in closing argument and then be barred to raise it on appeal. But we did do that by implication in a case called the United States v. Rusan. Now, it's a weird case because the guy essentially admitted that all of the elements were proven on count two in Rusan in closing argument, which for the life of me, I don't know how you ever get to that point as a lawyer where you do that. But it happened. And so why isn't that foreclosed by your argument? I would say three things as to that, Your Honor. One is that the jury is instructed by the court that the arguments of counsel are not evidence. Only evidence comes from the witness stand. And so if that were the case, everything someone argued would become evidence and we would get away from the idea that arguments are not evidence to mislead a jury. That's why they're told that. Secondly, the burden of proof on each and every element of the crime never leaves the government. And so I would argue in the Benson case that was mentioned in Mr. Casey's brief, there's just argument that there's some kind of a concession for the purpose of argument, but not for the purpose of saying that's exactly what he did. So I think in one instance, you're told that the arguments counsel is not evidence. And then now it's being used against a counsel saying, well, what he said in argument becomes evidence. And then the government's burden then shifts to the defendant, which it never shifts. So that would be my argument to the court's statements on that on that part. Mr. O'Connor, I have a follow up question on that, and maybe you can just clarify this for me, or I don't understand the the charge well enough. What was the evidence? Was the theory that there were multiple multiple moments of harassment or how the knowingly traveled? I guess I'm concerned. I was wondering whether there was any concern that a jury could take different moments of harassment. Different moments of travel across the interstate line to qualify for that. Can you help me understand just sort of how it's charged? I understand he was arrested on December 22nd, but I didn't understand the evidence really to be anything but October 1st in terms of counts one, two and three and four, which which on which he was acquitted. And that's a great question. I'll try to answer it as best I can. Is the only contact that he ever had with Lou was on October 1st. The only contact that he ever had with Lou was on October 1st. The others allege that their cars were broken into when to smash other stuff happened. Their car were there ever never able to identify Mr. Gross is that person. There was no evidence, even when they started following him later that I'll get to in my argument. But specifically as to these two interaction was on this one day. And that's why my second part of my argument. If you don't can I go there or did you have a further question about that? You may you may proceed with your argument as as you see fit. Thank you, ma'am. And so, second, he did so to engage in conduct that caused or attempted to cause substantial emotional distress to another person. So, let's say for the argument, he left Missouri for the argument. Interstate is there. I say it's not. But let's say for the argument, this court finds that he did. He had to have left to go to the state of Kansas with the purpose to cause emotional distress to another person. What he did was he went to a massage parlor in Lawrence, Kansas to tea spa massage. He went into a room, he removed his clothes, and he was ready for a massage. Now, this is where the argument to I, I want to interject. We find out after the trial is over that who the star witness, the madam testified falsely, and the government even admits committed perjury, which the statute on perjury 1621 says it's to a material fact. She didn't just give a false statement. She said, this is not a massage for sex or prostitution. This is not a legal house of your repute. And so that was the evidence. And so when, in fact, it was, because when the trial was over, we find out the government tells us that the day of Bob Gross's trial, the FBI is following her to the courthouse in Missouri, where she's going to testify under oath. And it's in the transcript. All the questions I asked her about whether it was a massage parlor, which she said no. And that was the evidence that was left with the jury. So the jury now is seeing a man who is coming out of a massage out of a room, naked, walking around on videotape, and they think, oh, he's over there for a massage, and this guy's come out. Now he's harassing these employees. What the heck's going on here? The whole premise of the government's theory of what was going on in the narrative was false. He was there for sex. You'd have to believe that when he left Missouri, assuming he did for the argument, he went there knowing that when he went to a room, and it's in the transcript, he'd been there 10 times, never had a problem with him. He was a good customer, and that he comes out naked saying, what's going on? The woman is eating a sandwich. He's mad, saying, come in, I've paid for the sex services. If you watch the video, she's laughing. When you watch the video, she just hardly pays attention to him. Pretty soon, he wants to get on the phone with the madam, which he does, which is Wu, and is saying, hey, what's going on there? Now, he's being a complete jerk. He's calling them names. He's telling this woman she's going to be reported because she's Asian. He's calling her a bitch. He's totally acting inappropriately. But you'd have to believe when he left Kansas City, if that's where he left, that he went there knowing he was going to be turned down, although he hadn't been turned down nine times before, and that she was going to not perform the service. Mr. O'Connor, was there any, as I understood the evidence, there was evidence that at least Wu understood that he had been denied services the night before. But what about Lu? Did she have anything to do with his inability to get the services the next day? I'm sorry, the previous day? Well, the trouble with that part is Lu never testified. The only person who testified, Wu, the only thing the jury got to see was a video of a poor woman being harassed and what was going on. But you have to believe when he left Missouri that he knew that day he was going to be denied, and then he was going to cause this problem. I guess my question is, my understanding of the government's theory, and counter me if I'm wrong, is that he was upset about being denied services the day before, and so he went with the intent to harass the folks because of what happened the day before. And my question was whether Lu had anything to do with the previous incident that the theory was based on. But the theory was based on he had went to another massage parlor and was denied a massage, not denied sex, because the government's whole case was a denial that these people were running a house of prostitution. I'll say this for the record, make it clear. I know that Jess Michelson did not know what he later found out when this case was over. But the FBI, they work out of the same building at 1300 Summit, FBI agents were following her to her testimony. FBI agents, at least 12 agents, sat through this entire trial and were witnesses in the case. You can't tell me that the government, which is a big entity, the government is the government, that those agents do. I'm confident they didn't tell Jess Michelson that someone sure as heck knew this was on the paper every day. It was the biggest case on TV, and you have FBI agents that are all working out of the same place just happened not to know about this woman. And so the presentation before the jury is, hey, we're just running a legitimate massage parlor. And this guy goes over for a legitimate massage. He gets denied and he's back the next day. He's just back the next day because he's now told he's going to get what he paid for the night before. The government had no other proof of that. They just are inferring because the night before he didn't get services is now he's back to harass. He shows up. It's on videotape. He walks in, he meets a woman, he pays the money, he goes to a room, he gets undressed. There's no conversation with her at that point other than she's going to perform the service. There's no intimidation. If he had walked in there saying, hey, I'm here because I got denied last night and you're going to do whatever I'm going to tell you to do. No, he went over there as if it's just another day of him going over there for the 10th time to be serviced by this woman. And from our defense standpoint, as you can understand, later, when we find out that we've committed perjury, when she testified, we would have wanted to call Lou to the stand because we want the jury to see this is a prostitute who performs services. She's not just there to give massages. It just puts a whole different bent on the jury. So would a verdict possibly be different if they really knew what the heck was going on there? But they were misled. They were misled by the government and they were misled in the whole case. Now, not purposely, but to me, whether you're misled purposely or unintentionally, you're still misled. And so as it relates to count two, I think it fails because what's the proof? He left Missouri with intent to go there on that day to intimidate and harass. Then they argue the only evidence as to who is after she was denied services, put his clothes on. She saw him driving through her cul-de-sac. She got his license number. He didn't come in contact with her. He didn't talk with her. He had no conversation with her. And so that is the count as relates to Wu. And so he had to she said he was there within minutes. So he didn't travel back to Missouri. He's now interstate from Lawrence to Lawrence to her house. So as to Wu, there's no traveling interstate. I mean, to Wu, I apologize. There's no interstate. And how did he know when he left Missouri he was going to be denied or he was going to get on a telephone with Wu? You'd have to assume he knew all that and traveled there with that purpose. It'd be like me if I left my house tonight to go to Kansas to a bar to have a drink and I got in a fight with someone. You could say, well, I traveled interstate and I got in a fight. And therefore, I'm guilty of interstate travel when I had no intention. When I left my house, I was going to go get a drink. His intention was to go have sex. But then the jury thought, oh, no, no, this isn't about sex. This is about a massage parlor legitimate. And he's over there arresting these legitimate people. And that's why I contend the jury found him not guilty of the other counts. Because when you get to those where they then put a poll camera up at that place, he never returned for three months. They put GPS on him, followed him all around. He bought handcuffs, bought all the stuff he read about. He never went around these victims. He never had contact with any of these victims. He never did anything other than drive his car around. And back when they thought they had him caught by one of their homes, turns out he was at another massage parlor, which was close to this place. This guy was just a guy who went and sought out prostitutes. Now, obviously, you can see from the record, he has serious other criminal violations and he's a serious criminal offender. But that's not enough when they can't even prove the actual elements of the crime. So I see my time is in and I have some time for rebuttal. Thank you. Mr. Casey. It pleases the court, Brian Casey, on behalf of the United States. And I'd like to start with issue two, which is the prosecutorial misconduct issue. And. In order to get a new trial based on the government, based on a witness giving false testimony, a government witness giving false testimony, the normal rule is that the government has to use the testimony and then there is a culpability element and then there is a materiality element. And the reason I stated generally here is because in this case we have a district court finding, an explicit district court finding that the government, if the government used the information at all, it was innocent. And that finding is significant because, one, this court has multiple cases that say that it reviews that finding for clear error. And I'm not sure. And I'll let Mr. O'Connor correct me, but I'm not sure that Mr. Gross challenges that ruling and says that it's clearly erroneous. I believe it's the case that they agree that the government's any use was innocent. And so that's the culpability prong that really makes that prong fall out of the court's analysis. And now what the court is looking at is use of the false statement. And now the materiality prong becomes much more difficult for the defendant to prove. It has to be a probable acquittal. So now, so in order to get a new trial based on this claim, the defendant has to show that the government used the information and that its use of the information, and that had it not used the information, there'd be a probable acquittal. And I think at this point, you know, kind of what surprised me researching this is there are a lot of cases on the issue. But there really weren't any cases that gave me, I think, gives this court or from this court a good definition of the term use in this context. And that surprised me. I expected to see cases that said, well, the government uses the false statement when it introduces it in this case in chief, or when it goes directly to one of the elements of the crime or when it argues it in closing argument. And those cases weren't there. The best I found, and I wish I'd done a better job drawing this out in our brief, is the Perkins case, which we do cite. And it talks about, well, the government didn't use it, and that the government did not mislead the jury. And I think that's a good practical standard to think about here, because in this case, the jury wasn't misled in any way. In fact, the jury had exactly the same information that the government had, that is, that the government suspected Wu's businesses of prostitution. And in order to show even further that the government didn't use this information, this was information that I think, honestly, there were sustainable objections. It really wasn't appropriate to come into the trial at all. But Mr. Conner came to the trial team pre-trial, fronted the issue, and they agreed. They said, we won't object. You can get into this issue. You can cross-examine her. You can ask government witnesses about this. The jury gets to hear what the government knows. And at that point, although there were some miscommunications at the FBI, and the trial team didn't know that the FBI had opened an investigation, nonetheless, the information that was predicated on was basically the same information that had been disclosed six months before to Mr. O'Connor. This was the Olathe PD investigation. And all these facts are in Mr. Michelson's affidavit, which is part of the record, which is credited by the court. And so I think some of the statements that Mr. O'Connor made were contrary to that affidavit and are contrary to the record in this case. And one of those statements was that the FBI was conducting surveillance of Ms. Wu at the courthouse on the day she testified. That's not what the affidavit says. It's not in the record. What the record in this case says, and what is true, is that on the same day surveillance was conducted. But it was conducted after she testified at night in Olathe at her businesses. Mr. Casey, could I ask you a little bit about her testimony at the trial? Because she's the only if Mr. O'Connor O'Connor represented that Wu testified, but Lu did not. Is that that's correct, right? So I'd like to probe a little bit about the evidence of the intent. Did all of the intent to harass Lu come from the testimony of Wu? Largely, Your Honor, it came from the video. So the entire incident of Mr. Gross's interaction with Lu is on the video. And so what part of that video gives you what's your what's your best sort of representation of that video that would tell the jury not what he did, but what intent he had when he was still in Missouri and had plans to go across to Kansas? Well, he tells the jury, Your Honor, on the video, he says, I came in, I came into your stores. I was on the phone with Wu. I came into your stores yesterday. I was denied. I'm angry about it. And then he immediately began acting in a very angry, abusive manner to Lu when he entered the store on the next day. Well, then was was Lu one of the people that did not? Was she present when he was denied services? I understand what you're saying about Wu. You've got that conversation and he's directly saying that. I'm just I'm curious about your theory about Lu and how what what intent he would have had toward her if she didn't have anything to do with what happened the night before. It was Wu's business, so to speak. I think the jury very rationally inferred that his intent was to harass whoever he encountered. And I think when you're talking about traveling to do some act of harassment, in some ways that intent will always be conditional. In fact, it'll be conditional. Am I going to see the person? Am I going to make it across the state line? And so I think the jury very reasonably could have inferred that when he traveled across the state line, it was to go to one of Wu's businesses and harass the people that were there. And so and I don't know that maybe I should probably know the answer to this question, but does this statute doesn't require an intent to harass a specific person? It can even though you've named the person that he had the intent to harass in the indictment. So you didn't need it. It could have been just anybody. I think it's probably across state line with the intent to harass and then that he in fact caused the particular person the required distress. And so your position is that even though you name the person that he had the intent to harass in the indictment, that you don't have to prove that he had the intent to harass that particular person? Well, your honor, I think I think we do. I think we did prove it. But I think you're catching what you're getting caught up on is whether he had a name in mind when he crossed the state line. And that's right. Right. A particular person. Right. Right. He did have a particular person. He had the person I encountered at Wu's business. And in this case, the person he encountered at Wu's business happened to be Ms. Lu. But he might not have known today. I don't think he had to intent. And the statute doesn't require him to specifically say today I'm going to encounter Lu. I'm going to harass Lu. I'm going to go over there to harass the person that I encountered. It happened to be Lu. He did harass her. He did cause her the sufficient distress. And that is all more than sufficient for the jury to do as it did here and infer that he make the reasonable inferences to convict. You know, if you and I have to confess, I haven't looked at this video for a long, long time, but but it seemed to me that I may not even have seen the beginning of the video. But it seemed to me that if you're looking at this thing, there's didn't didn't gross appear, go into the room, strip naked, then come out and complain once the services weren't being provided. And does that break this inferential chain at all? I mean, as I understand, and I may be I may be wrong, but I don't I don't know that there was anything that showed that that like he walked in right away and was screaming and hollering and harassing. Am I wrong? Did I just just don't got it right? No, you're correct, Your Honor. And correct on the facts. But on the law, the interstate travel to harass doesn't it needs to be a part of his intent. It doesn't need to be the primary purpose. And so, again, we're talking about, you know, here, you know, I think the jury could have reasonably inferred his intent to be this. I'm intending to travel across the state line and maybe I'm intending to harass whoever I run into, which is pretty much what he did. Or maybe if I get what I want, then I won't harass. But he's still going with the intent to harass. He's going with the intent to harass, whereas he would he would say, well, I don't go through with it if I get what I want. But that still doesn't negate the inference of the intent to harass. All right. So your argument essentially is a conditional intent to harass is sufficient to be an intent. Absolutely, Your Honor. Okay. And I believe the case law supports that. In the cases we cite in the brief about not having the intent to harass as your primary purpose, I think underscore that. Mr. Casey, can I ask you a question about the sentence? There were he was convicted on six firearm counts, right? That's correct. And the six all relied on three, three guns, six counts for three guns. That's correct, Your Honor. So here's my question, and I couldn't find anything on this, and maybe I'm way off base, but it seemed to me that, well, under 922 G, you can't get consecutive sentences for both being someone convicted of a previous felony and being in possession of a firearm and being some an unlawful user of drugs and being in possession of a firearm. Why doesn't that apply to another status, which is in a different subsection, the N, which is being under indictment? Why isn't that also a status or a qualification that would be treated the same way as all of the other subsections under 922 G? Well, Your Honor, they're different crimes with different elements. And I kind of hesitate to refer to the old block burglary test, but here you're talking about receipt of a firearm while under indictment versus possession of a firearm while in a particular status. Right, and I'm going to push you a little bit on that because I understand that N is separated out as simply receipt or transportation, but the case law is also that if it's the same firearm, at least under 922 G, and it's both possession and receipt, you can't charge those separate acts out. So why could you separate the act out of possession under 922 G and but just put the receipt into not into N, but they're both status offenses. I'm struggling with finding out what the separate harm or what the separate act is that's being criminalized because I don't think block burger necessarily gets you as far as you need to go because that analysis didn't get you through the 922 G separations either. Well, Your Honor, I'll be honest. This wasn't an issue raised in the briefs, and it's not on appeal. If the court wants to look at it, I would ask for the ability to provide self a little briefing. Fair enough. I guess my final question would be, was this discussed at all at the lower court? Not at all. Not at all. And all three elements are different. So there's so 922 G is knowingly in, I believe, requires a specific intent. That is, you knew you couldn't possess the gun. You couldn't receive. So it's a different it's a different knowledge element. The possession versus receipt is a different element. And then the status itself is different. So they don't overlap on any of the three elements. And so I'm not entirely sure that the transfer that you're talking about really is something certainly something I'm aware of. No case that would justify it. I'm sorry, Mr. Case. I've got one more question on intent. If you could clarify for me, does the traveling with intent to harass relate only to the Mr. Gross's travel to the massage parlor? Or does it also relate to his travel to Miss Wu's neighborhood to harass her there? Every trip across the state line, it could go up. The jury could have found the intent and convicted on that. Because there was no. So even if there wasn't adequate proof of the travel with intent to harass as to the massage parlor, it could have been with the with respect to travel to Miss Wu's neighborhood. That's correct. The subsequent trips and they're documented in the brief, mostly in December. Also, the jury could have found he had the intent at that point. And some of those trips were to this military supply store where he's buying. Clearly, that's conduct that had the victims known about it would have would have been threatening. He was buying surveillance gear. He was buying handcuffs. And so that intent to get that that behavior that would have been threatening and the intent to do it when he crossed the state line also was sufficient. Can I follow? I'd like to follow up, Mr. Case. And if I'm understanding what you're saying, how you were mentioning when he goes to the surplus stores for the the gear, what was your point on that? What what are you saying about that? Well, he's he has to travel across the state line with intent. And he asked, I'll have a course of conduct that would that would cause the fear. And if the if the victims would have known that he was driving through their neighborhoods at the same time going to a survey to a to a supply store and buying handcuffs, that certainly is conduct he could have foreseen would would cause fear. And there's a case we cite where the court found sufficient evidence or someone traveled to harass across the state line. The police arrested him before he reached the victims. They then told the victims and the victims quite clearly were distressed by it. And that was sufficient evidence. And so here, the attempt prong, I think, covers those subsequent. Would you have to would you have to have another crossing of the state line or can you rely on the one that you have started out with on October 1st? Well, he did go back and forth. And so I don't think I understand the question. The later December. So was there another was was there evidence that he crossed into Kansas from Missouri to go to those stores to support your theory that that was also. That's right, Your Honor. That's all on the GPS tracker. Yes. Thank you. We kept you a little bit long. Mr. O'Connor, you don't have any rebuttal left, but we kept Mr. Casey a little while. Would you like two minutes to respond? I would judge his brain. I'll make it very brief. I do agree that the that the government, the lawyers conduct was innocent. There's no question in my mind about that. But the charge says United States of America versus Robert Gross. And the FBI is part of the United States of America. And so someone along the line here knew or should have known. And so I don't know that because you can't attach it to an attorney who's handling this. Someone in the government knew clearly knew it did not share that information. I don't know the purpose, but they didn't. Secondly, as to your honor's question, Lou did not speak English. And so there's no evidence of what she was feeling about harassment other than he was out there walking around. That's why they got Wu on the phone. That's why when she later went out and brought the gentleman who came in to help. And Mr. Gross was then dressed. He had to get on the phone and he still couldn't understand who because she speaks a little English, but not a lot. And again, there's no proof of intent on that day in this case that he went there with the purpose to harass. I think the court hit the nail on the head. He goes into the room. The video shows that he's expecting sex, doesn't get it. And that's when I believe he forms the intent. And clearly, when he leaves to go to the neighborhood of Wu, he's leaving Lawrence to go to Lawrence interest state, not interstate, of which he could have never known he was going to do that when he left Missouri because he would have never known that he was going to be turned down. He was going to be on the phone with Wu and then he was going to be going to his house. So he had to have all those intense form. All those intent. They were formed in the state of Kansas. That's all I have. Thank you. Thank you. Thank you to both counsel for your arguments here today. We appreciate it. And we appreciate your briefing and we will take the matter under advice.